JUDGE MARRERO

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



COVENTRY FIRST LLC, a Delaware Limited Liability Company, )

7111 Valley Green Road
Fort Washington, PA 19034 )

          Plaintiff, )

    vs. )

AXA EQUITABLE LIFE INSURANCE COMPANY, an insurance company organized under the laws of the State of New York, )

1290 Avenue of the Americas,
New York, NY 10104 )

         Defendant. )

10 CIV 9418

No. ____

RECEIVED
DEC 17 2010
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

1.    This action arises out of the repeated, intentional, knowing, and unlawful conduct of Defendant AXA Equitable Life Insurance Company ("AXA") aimed at denying its life insurance customers the fair market value of their insurance policies and interfering with the business of Plaintiff Coventry First LLC ("Coventry First"). Over time, a secondary market for life insurance has developed in which life insurance policy owners can sell their policies to companies such as Coventry First, which then hold the policies until maturity or resell them to other buyers. These transactions are known as life settlements. This secondary market benefits policy owners, who are able to obtain fair market value for their policies, often far in excess of the value such policy owners would have received through a lapse or surrender of their insurance policies to the insurer. It also benefits the buyers, who may earn a profit when the policies mature or are sold to a downstream purchaser.

2.      AXA, however, is threatened by the secondary market because it cuts into the profits AXA reaps when a policy owner allows his or her policy to lapse or surrenders the policy after many years of making payments.  When that happens, AXA retains the premiums paid since the policy's inception without ever having to honor its commitment to pay a death benefit when the insured dies.  To protect its windfall profits and to procure as many policy lapses as possible, AXA has intentionally and repeatedly disrupted competition from the secondary market, impeded Coventry First's rights, and violated laws protecting the fair marketplace for insurance policies, including statutes prohibiting fraudulent conduct in connection with life settlements.  For example, upon information and belief, on numerous occasions AXA has knowingly and intentionally provided false information to Coventry First during Coventry First's evaluation of life insurance policies for potential purchase.  This is but one manifestation of the anti-competitive actions AXA has taken as part of an overall scheme to deprive consumers of an established contractual and fundamental property right.  These actions were directed not only at impeding the specific life settlements described below, but also at deterring Coventry First and others from participating in life settlements involving AXA policies.

3.      As a result of its anti-competitive actions, AXA has impaired its policy owners' ability to exercise their right to seek fair market value for their unwanted or unneeded life insurance policies and has inflicted damages well in excess of $75,000 on Coventry First.  This suit seeks to hold AXA to account for its actions and to protect Coventry First from further injury.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Coventry First is a Delaware limited liability company.  Its sole member is Montgomery Capital, Inc., a Delaware corporation with its principal place of business in Pennsylvania.  Coventry First is a family-operated company and a leading life settlement provider. Coventry First is authorized or licensed to do business in virtually every life settlement jurisdiction throughout the United States, including Florida, New York, New Jersey, and

2

Nevada.  As such, Coventry First is well known to AXA and other insurance companies as a provider of life settlements to their policy holders.

5.      Defendant AXA Life Insurance Company is an insurance company organized under the laws of the State of New York with its principal place of business in New York.

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because Coventry First is not a citizen of the state where AXA has its principal place of business or the state in which AXA is incorporated, and the amount in controversy exceeds $75,000.  To the extent Coventry First seek declaratory relief, the value of the object of the litigation exceeds $75,000.

7.      This Court has personal jurisdiction over AXA because AXA is a resident of New York.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) because AXA resides in this district pursuant to 28 U.S.C. §§ 1391(c).

## BACKGROUND

## I.      The Secondary Market for Life Insurance Policies.

9.      Life insurance is commonly used by businesses, individuals, and families to meet their future financial needs.  The United States Supreme Court has long recognized that "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving." *Grigsby v. Russell*, 222 U.S. 149, 156 (1911).  Life insurance can serve a person's or business's needs in a number of ways.  In some cases, it may be desirable to hold a policy until the death of the insured, when the death benefit becomes available to the beneficiaries.  This, however, may occur many years after the policy is purchased.  In the interim, financial needs and circumstances often change.  When such changes occur, it is frequently in the policy owner's interest to recoup some value from the policy before the insured dies.

10.      Historically, policy owners had two options for disposing of an unneeded or unwanted insurance policy: stop paying premiums and allow the policy to lapse, or surrender the

policy to the insurance carrier in exchange for its cash "surrender value"—a sum of money established by the insurer as the sole buyer of the policy—minus a surrender charge. The surrender value paid by insurers typically averages between 3% and 5% of the policy's face value. When a policy lapses, its owner loses the policy without remuneration or any return on the premiums paid. The historic options of lapse or surrender did not provide policy owners with the fair market value of their policies.

11.   Life insurance policy owners, however, have the right to sell their policies for fair market value. As the Supreme Court of the United States, through Justice Holmes, said: "So far as reasonable safety permits, it is desirable to give to life policies the ordinary characteristics of property. . . . To deny the right to sell . . . is to diminish appreciably the value of the contract in the owner's hands."[1]

12.   Prior to the development of the secondary market, a consumer had only one potential buyer for her or his life insurance policy: the insurer from whom the consumer had purchased the policy in the first place. In technical terms, an insurer such as AXA enjoyed a monopsony[2] with respect to its customers: it and it alone could set the price it would pay to consumers who wished to surrender their policies. The secondary market provides a means of realizing a policy's full market value, and a valuable alternative to its lapse or surrender. Life settlements provide competition to the surrender values offered by insurers. The fair market value of insurance often exceeds the surrender value by as much as three to four times. As such, the secondary market permits policy owners to derive substantial economic value from their life

---

[1] *Grigsby*, 222 U.S. at 156 (citation and footnote omitted).

[2] Monopsony is "[a] condition of the market in which there is but one buyer for a particular commodity." Black's Law Dictionary at 1007 (6th ed. 1990). Monopsony is very similar to monopoly, because only one "market" participant can set prices for a given commodity. Also like a monopoly, the insurers' unchecked dominance was profoundly unfair to consumers, who had no other buyers for their unwanted policies. The advent of the secondary market offers consumers a choice and provides competition to balance the power of insurers.

4

insurance assets during the life of the insured.[3]  During its nine years of operation, Coventry First has paid more than $3 billion to consumers participating in life settlements, or, on information and belief, approximately four times what insurers would have paid for surrender of the same policies.

13.     The secondary market for life insurance has been recognized by the Securities and Exchange Commission, the National Association of Insurance Commissioners, the National Council of Insurance Legislators, the United States Government Accounting Office, and the Financial Accounting Standards Board as creating more value for life insurance consumers than is available from the insurance carriers themselves.

14.     State legislatures, courts, and insurance regulators across the country have likewise recognized consumers' rights to sell their unwanted or unneeded insurance policies in the secondary market via life settlements.

15.     A life settlement enables a policy owner to sell a policy to a life settlement provider for (1) a cash payment that is more than the surrender value offered by the issuing insurance company but less than the death benefit and/or (2) the ability to retain part of the policy's death benefit with no further obligation to pay premiums.  The life settlement provider may continue to pay premiums and, when the policy matures, collect the death benefit.

16.     In many cases, as AXA is aware, the life settlement provider will re-sell the policy to an investor instead of holding the policy for its own account.  Coventry First usually re-sells policies to investors.  The investors continue to pay premiums and, when the policy matures, collect the death benefit.  The investors with whom Coventry First transacts business are sophisticated, institutional investors.

17.     Insurers have engaged in numerous tactics to delay, suppress, and interfere with the competition created by life settlement transactions, including but not limited to delaying or

---

[3] The policy owner often is not the insured.  Many life insurance policies are owned by trusts, corporations, or family members of the insured.

failing to provide policy illustrations, verifications of coverage ("VOCs"), and confirmations of changes of ownership; delaying paying death benefits under policies that have been purchased by life settlement providers; refusing to reinstate or reissue policies; suing insureds and policy owners; and prohibiting their agents and brokers from assisting or even discussing life settlements with policy owners. AXA's actions described below are simply examples of its efforts to maintain the windfall profits it receives when a policy lapses or is surrendered to AXA.

18.     Insurers may seek to escape their obligations under an insurance policy by contesting the policy during its contestability period. The contestability period, typically two years, is the timeframe in which an insurance carrier may contest the policy's validity based on certain alleged material misrepresentations in the application for insurance.

19.     Insurable interest issues, if present, arise at the time the affected policy is issued. AXA, however, on information and belief, takes the position that, even beyond the two-year contestability period, an insurer may seek to have a policy ruled void *ab initio* by claiming that the policy holder lacks a proper insurable interest in the life of the insured. As a result, when AXA raises the specter of an insurable interest claim, it raises questions about whether the policy is a valid asset and may prevent the policy holder from finding a willing buyer for the policy.

20.     In this matter, AXA has sought improperly to exploit both the contestability and insurable interest issues described above.

## II.    AXA Undermines Life Settlements.

21.     AXA is one of the largest life insurance companies in the United States. It offers insurance products in all 50 states, Washington DC, and Puerto Rico, and has more than 2 million insurance policies in force. Life insurance policies are sold through affiliates of AXA, including AXA Advisors and AXA Network, as well as by independent brokers and financial institutions via its wholesale brokerage unit, AXA Distributors. AXA has approximately $540 billion under management.

22.     AXA's business includes providing policy information to life settlement companies, such as Coventry First, under the circumstances relevant to this case.

6

23.     Despite the fact that life settlements benefit consumers, are often important components in pension plans' and others' investment portfolios, are provided for by law, and have been recognized by AXA as a legitimate estate planning tool, AXA has undertaken efforts to bolster its profits by obstructing the competition created by life settlement transactions.

### A.     Life Settlements Threaten AXA's Profits.

24.     As part of its business model, AXA—like other life insurers—anticipates that a substantial number of policy owners will forfeit their life insurance policies by allowing them to lapse prior to the insured's death. As a chief actuary from one major insurance company noted, "companies count on policies to lapse in order to support those that don't . . . . each time a policy lapses, the [insurance] company's gain is much larger than would reasonably be expected. . . . If the company's original assumption for lapse rates materializes, it only must pay a few persisters, or 'winners.' The vast majority of policyholders who lapse their policies before death are the 'losers.' They receive much less at surrender than what any reasonable person would perceive as acceptable value."[4]

25.     When an insured's policy lapses, AXA retains the premiums paid to date without any risk that it will have to pay a death benefit to the policy's beneficiaries. AXA recognizes that its "earnings for any period depend in part on the . . . . lapse rates and anticipated surrender charges."[5]   Life settlements frustrate this windfall-profit model because they reduce the incidence of policy lapse and surrender. Unlike many policy owners, life settlement providers and subsequent purchasers buy policies with the intention and capacity to hold them to maturity.

26.     Advisors to the insurance industry have cautioned insurers about the impact of life settlements on insurers' bottom lines: "[D]ecreased lapse rates resulting from secondary market transactions threaten to debilitate traditional actuarial assumptions. The reality of the secondary

---

[4] William C. Koenig & Stephen H. Frankel, *Don't Forfeit Nonforfeiture*, Best's Review, June 2000, at 119.

[5] AXA Equitable Life Insurance Company, Annual Report (Form 10-K), at 1A-4 (Mar. 10, 2010).

market for insurers and reinsurers is that fewer premiums will be received, fewer premiums will be ceded, and more claims will be presented. The insurance industry must take stock of its exposure."[6]

27.    AXA could offer its customers a fair, market-derived value for their policies. AXA, however, refuses to provide its policy holders with such an option.  Instead, AXA has adopted a pattern and practice of stifling its competition for a lapse or surrender by identifying potential life settlement transactions and unlawfully frustrating or preventing those transactions, thereby maintaining its monopsony.

**B.    AXA Seeks To Identify Life Settlement Transactions.**

28.    The first step in AXA's efforts to protect its windfall profits is identifying potential life settlements.

29.    The life insurance policies issued by AXA provide policy owners with a contractual right to freely assign their life insurance policies.  For example, AXA contractually agrees that, "[w]hile the insured person is living, you may change the owner or beneficiary by written notice. . . ."  AXA also contractually agrees that the policy owner "may assign th[eir] policy."

30.    These contractual rights are in addition to Federal and State laws and regulations that permit policy owners to freely assign their insurance policies.

31.    When owners of policies validly issued by AXA have no longer needed or wanted their policies, they have tried to exercise these rights to sell their policies in the secondary market.  AXA, however, has undertaken to preemptively identify life settlement transactions in order to frustrate them.

32.    When it learns that a policy owner seeks to change the beneficiaries of a validly issued life insurance policy, AXA demands that the policy owner state whether any of the new

---

[6] Stephen C. Baker, et al., *The Secondary Life Insurance Market: Not Just a Fraud Problem*, Journal of Reinsurance (Fall 2004).

beneficiaries is a life settlement company. Similarly, when a policy owner seeks to assign or transfer ownership of a life insurance policy, AXA requires the policy owner to state whether the ownership change is in connection with a life settlement transaction. AXA also attempts to identify life settlement transactions by flagging life insurance policies about which AXA receives requests for policy illustrations to age 100 or other requests that might indicate that a policy owner is considering selling a policy to a life settlement provider.

**C.    AXA Seeks To Undermine Life Settlement Transactions, Punish Life Settlement Participants, and Suppress the Life Settlement Market.**

33.    Once AXA has identified a potential life settlement transaction involving a policy it issued, AXA acts to undermine the transaction. As the below examples reflect, it does so in various ways that, taken individually or in combination, are designed to frustrate a given life settlement transaction and preclude policy owners from exercising their property rights in their policies.

34.    At the early stages of a life settlement transaction, AXA provides false information concerning whether the policy in question is contestable. AXA initially states that the policy is not contestable to induce Coventry First to contract for its purchase, only to say the exact opposite once the purchase has been consummated. Because a contestable policy may not be a valid asset, Coventry First will be unable to sell the policy for a fair price during the two-year contestability period or must repurchase the policy if it already has been sold to an investor. AXA typically refuses to provide any basis for its contestability assertions, and refuses to provide the documentation required for Coventry First to independently assess AXA's representations.

35.    Later in the life settlement process, when AXA can no longer credibly claim that the policy is contestable, and after it has collected premium payments month after month, AXA asserts that the policy owner lacked an insurable interest in the life of the insured, which, if true, would render the policy void *ab initio*.

36.    This was precisely AXA's response to this dispute.  Promptly after being put on notice of Coventry First's claims, AXA filed a summons with notice in New York state court, in which it sought a declaratory judgment as to whether one of the policies in question was void *ab initio*.  It voluntarily dismissed that action when Coventry First threatened sanctions, including attorneys' fees.  Since then, AXA has refused to state unequivocally that it will not reassert an insurable interest challenge, despite the policies having been in force for 20 and 6 years, respectively, and has refused to compensate Coventry First for the damages it has suffered and continues to suffer.

### 1.    AXA Wrongfully Uses Verifications of Coverage to Impede Coventry First's Life Settlement Transactions.

37.    In order to exercise its right to assign a life insurance policy to Coventry First, an AXA policy owner authorizes Coventry First to seek from AXA various types of information concerning the policy, including whether the policy is valid and enforceable.  This information typically is provided in a VOC.  A VOC includes ownership information, as well as information concerning the status, financial condition, and history of a life insurance policy.  VOCs enable Coventry First to confirm such things as the policy number, the insured's name and date of birth, the identity of the policy owner, the policy's maturity date, the death benefit, the policy type (universal, term, variable universal life, survivorship whole life, etc.), the existence of any liens, loans or collateral assignments, the cash surrender value of the policy, the account value of the policy, the effective issue date of the policy, whether the policy is contestable, whether the policy has lapsed and been reinstated (thereby starting a new contestability period), and the premiums due.

38.    Obtaining an accurate VOC typically is one of the final requirements before Coventry First purchases a life insurance policy.  AXA is aware that its competitors in the life settlement market, including Coventry First, rely on VOCs with respect to their life settlement transactions.  AXA has discussed with Coventry First the importance of VOCs to Coventry First and Coventry First's reliance on VOCs in conducting its business.

39.     AXA also is aware that Coventry First's ability to re-sell life settlement policies to investors is directly affected by the reliability of the information provided by AXA to Coventry First. When that information is unreliable, incorrect, or false, Coventry First may be compelled to repurchase policies it has sold to investors, and the values of the affected policies may be impaired.

40.     It is AXA's obligation to provide accurate VOCs and policy information to policy owners or their authorized representatives (*e.g.*, accountants, attorneys, and holders of powers of attorney, such as life settlement companies) who request them. In addition, in many states in which life settlement transactions are subject to specific regulations, AXA has a statutory duty to provide licensed life settlement providers with accurate VOCs within a specified time period. In violation of its duty to provide accurate information in its VOCs, AXA has provided false VOCs to Coventry First, including false statements regarding whether policies are contestable (and thus outside of Coventry First's normal purchasing parameters).

41.     Because AXA has provided false and conflicting information to Coventry First regarding its policies, Coventry First has been compelled to repurchase the affected policies from investors, forfeiting the income it made on those sales. This has caused financial injury to Coventry First and impaired Coventry First's ability to re-sell policies to investors. On information and belief, AXA has undertaken these acts intending to discourage Coventry First and other life settlement providers and investors from participating in life settlement transactions involving AXA policies.

42.     AXA has refused to issue VOCs to Coventry First despite the fact that Coventry First has satisfied all prerequisites to issuance. On other occasions, AXA has refused to provide a VOC to Coventry First (or has delayed responding to Coventry First for weeks, only to issue an incomplete VOC) and has told Coventry First that it reserves the right to contest the policy at any time in the future.

43.     AXA also has raised spurious insurable interest claims with respect to AXA policies involved in life settlement transactions.

11

44.     Upon information and belief, AXA engaged in these actions because it intends to harm Coventry First and discourage Coventry First and other life settlement providers, as well as investors and consumers, from participating in life settlement transactions involving AXA policies.

45.     Such actions are unlawful and undermine the rights of policy owners to freely assign their life insurance policies to life settlement providers.

46.     The following transactions exemplify AXA's pattern and practice of unlawful activities.

> **a.      AXA Unlawfully Undermines the Purchase and Re-Sale of the Donahue Policy.**

47.     In November 2008, Mr. Donahue (an individual residing in New Jersey)[7] expressed an interest to Coventry First in selling his AXA life insurance policy ("the Donahue Policy"). The Donahue Policy was converted from a term life insurance policy that was issued on June 15, 2004 with a net death benefit of $1,000,000.

48.     Mr. Donahue completed a life settlement application on December 26, 2008. Coventry First requested a VOC for the Donahue Policy on January 2, 2009. AXA was required by New Jersey law to provide an accurate VOC to Coventry First.

49.     AXA provided a signed VOC for the Donahue Policy on January 7, 2009. The VOC, which is dated January 6, 2009, was signed by Ronald F. Lambe, Vice President for AXA. The VOC stated that the Donahue Policy was not contestable.

50.     As part of its efforts to assess the Donahue Policy, Coventry First requested a copy of Mr. Donahue's medical file from AXA. After reviewing Mr. Donahue's file, Philip M. Herr, an AXA senior case design specialist, informed Coventry First in a January 13, 2009 letter that Mr. Donahue's medical information was unavailable because Mr. Donahue's coverage had successfully been converted to a permanent life policy. The fact that AXA conducted this review

---

[7] Coventry First seeks to protect the privacy of insureds and policy owners. However, AXA previously has publicly disclosed the identities of the policy sellers at issue in this matter.

of Mr. Donahue's file without finding any basis for contestability provided Coventry First with further assurance that the Donahue Policy was not contestable.

51.     AXA was aware that Coventry First was relying on the foregoing representations in making its decision to purchase the Donahue Policy.  On January 21, 2009, in reliance on the foregoing representations, Coventry First purchased the Donahue Policy.  This life settlement was governed by New Jersey law.

52.     In reliance on AXA's statements, Coventry First resold the policy to an institutional investor on January 21, 2009.

53.     During a telephone conversation on October 26, 2009 and in a letter dated October 29, 2009, however, AXA Vice President Margretta J. Bowen represented to Coventry First that the Donahue Policy was contestable.

54.     AXA refused to provide any evidence to Coventry First to substantiate its new claim that the Donahue Policy was contestable.

55.     AXA's changing story and refusal to provide information in support of its contestability assertion rendered Coventry First incapable of determining which of AXA's representations was actually false—the VOC in January 2009 stating that the policy was valid and incontestable, or the subsequent declarations in October 2009 that the policy was contestable.  The information necessary to make this determination is solely within AXA's control.

56.     Upon information and belief, AXA took these contradictory positions to induce Coventry First's purchase of the Donahue Policy, and then thwart Coventry First's resale of the policy, because AXA is trying to discourage life settlements.

57.     As a result of AXA's assertions that the policy was contestable, Coventry First repurchased the policy from an investor on December 30, 2009, forfeiting back to the investor the compensation Coventry First had received on the sale to the investor.

58.     After repurchasing the policy from the investor, Coventry First sold the Donahue Policy to LST I LLC ("LST"), an affiliate of Coventry First.

59.     On December 17, 2010, Coventry First repurchased the Donahue Policy from LST, including all of LST's rights, title, and interest in the policy, and of LST's rights, remedies, powers, and privileges with respect to the policy.  All claims that Coventry First or LST has had at any time with respect to the Donahue Policy are currently owned by Coventry First.

60.     For many months following Coventry First's repurchase of the policy in December 2009, AXA knowingly and intentionally refused to state that the Donahue Policy is incontestable.  In fact, AXA filed a summons with notice in New York state court in August 2010 seeking a declaration, *inter alia*, that the Donahue Policy is invalid and/or void *ab initio* (due to supposed insurable interest issues).  AXA also asked in the Summons that AXA be allowed to retain "some or all of the premiums paid," even if the Donahue Policy were ruled to be void or invalid.

61.     AXA named as defendants in the summons Mr. Donahue and the securities intermediary for the Donahue Policy, neither of whom were proper defendants.  Upon information and belief, AXA filed the suit as part of its efforts to deter life settlements, including by naming the policy owner.

62.     After counsel for Coventry First informed counsel for AXA that Coventry First would seek attorneys' fees and costs in connection with the New York state court action, which Coventry First believed was improperly brought, AXA relented and voluntarily dismissed the summons.

63.     AXA now states that the Donahue Policy is not contestable.  AXA, however, has refused to state without equivocation that it will not renew its insurable interest claim against the Donahue Policy.

64.     Having  filed a suit in New York state court seeking a declaratory judgment that the Donahue Policy is void for lack of an insurable interest and having refused to state without equivocation that it will not renew that claim, AXA has impaired the policy's value.

65.     Upon information and belief, AXA undertook these actions to undermine Coventry First's sale of the Donahue Policy and damage Coventry First's business because AXA

14

is trying to discourage life settlements generally and, in particular, life settlements involving AXA policies.

66.     Because of AXA's actions with respect to the Donahue Policy, Coventry First has suffered and continues to suffer financial harm in excess of $75,000, including but not limited to its lost fees and profits on the sale of the policy, premiums paid to AXA, the impaired value of the Donahue Policy, and other costs, damages, and expenses.

b.     **AXA Unlawfully Undermines the Purchase and Re-Sale of the Folkenflik Policy.**

67.     In August 2008, Mr. Folkenflik (an individual residing in Nevada) expressed an interest to Coventry First in selling his AXA life insurance policy ("the Folkenflik Policy"). The Folkenflik Policy was issued on August 31, 1990 with a net death benefit of $2,500,000.

68.     Mr. Folkenflik completed a life settlement application on March 2, 2009. Coventry First requested a VOC for the Folkenflik Policy in March 2009.

69.     AXA provided a signed VOC for the Folkenflik Policy on March 25, 2009. The VOC, dated March 24, 2009 but faxed to Coventry First the following day, was signed by Ronald F. Lambe, Vice President for AXA. The VOC stated that the Folkenflik Policy was not contestable.

70.     On March 25, 2009, an AXA representative named Robin confirmed that March 25, 2009 VOC was AXA's definitive statement regarding the status of the policy.

71.     AXA was aware that Coventry First was relying on the foregoing representations in making its decision to purchase the Folkenflik Policy. On April 1, 2009, in reliance on the foregoing representations, Coventry First purchased the Folkenflik Policy. This life settlement was governed by Nevada law.

72.     On April 1, 2009, in reliance on AXA's representations that the Folkenflik Policy was not contestable, Coventry First sold the Folkenflik Policy to an institutional investor.

73.     In a letter from AXA's Heather Demby dated April 2 ,2009 and a voicemail from Sandra at AXA dated April 3, 2009, AXA represented to Coventry First that the Folkenflik

Policy was contestable. On or about April 6, 2009, AXA provided Coventry First with a VOC (dated April 3, 2009) stating that the Folkenflik Policy was contestable.

74.     AXA refused to provide evidence to substantiate to Coventry First its new claim that the Folkenflik Policy was contestable.

75.     AXA's changing story and refusal to provide substantiating information rendered Coventry First incapable of determining which of AXA's representations was actually false—the VOC on March 25, 2009 stating that the policy was valid and incontestable, or the subsequent assertions on April 2, 3, and 6, 2009 that the policy was contestable. The information necessary to make this determination is solely within AXA's control.

76.     Upon information and belief, AXA engaged in the above-referenced conduct to induce Coventry First's purchase of the Folkenflik Policy, and thwart its subsequent resale of the policy, because AXA is trying to discourage life settlements.

77.     After repurchasing the policy from the investor, Coventry First sold the Folkenflik Policy to LST, an affiliate of Coventry First.

78.     On December 17, 2010, Coventry First repurchased the Folkenflik Policy from LST, including all of LST's rights, title, and interest in the policy, and of LST's rights, remedies, powers, and privileges with respect to the policy. All claims that Coventry First or LST has had at any time with respect to the Folkenflik Policy are currently owned by Coventry First.

79.     For many months following Coventry First's repurchase of the Folkenflik Policy, AXA knowingly and intentionally refused to deem the Folkenflik Policy incontestable.

80.     AXA now asserts that the Folkenflik Policy is not contestable. AXA, however, has not stated without equivocation that it will not raise an insurable interest claim against the Folkenflik Policy.

81.     Upon information and belief, AXA undertook the foregoing actions with respect to the Folkenflik Policy to undermine Coventry First's sale of the Folkenflik Policy and harm Coventry First because AXA is trying to discourage life settlements generally and, in particular, life settlements involving AXA policies.

16

82.     Because of AXA's actions with respect to the Folkenflik Policy, Coventry First has suffered and continues to suffer financial harm in excess of $75,000, including but not limited to its lost fees and profits on the sale of the policy, premiums paid to AXA, the impaired value of the Folkenflik Policy, and other costs, damages, and expenses.

c.     **AXA Unlawfully Undermines the Sale of, and Refuses To Reinstate the Golden Policy.**

83.     In or about October 2008, Mr. Golden (an individual residing in Florida) expressed to Coventry First an interest in selling his AXA life insurance policy ("the Golden Policy"), a valid insurance policy supported by legally adequate consideration. The Golden Policy was issued on December 29, 2006—its register date was October 8, 2006—with a net death benefit of $12.5 million.

84.     Mr. Golden completed a life settlement application in November 2008.

85.     Coventry First requested a VOC for the Golden Policy on November 7, 2008. AXA provided a verbal VOC for the Golden Policy on or about November 18, 2008. In the verbal VOC, AXA told Coventry First that the Golden Policy was not contestable. During the November 18, 2008 call, AXA did not disclose that the policy was in grace[8] and would be considered to have lapsed if a premium payment was not received on or before December 8, 2008.

86.     On or about November 25, 2008, Coventry First received an internally inconsistent VOC stating that the Golden Policy had lapsed as of October 8, 2008 but that the Golden Policy nonetheless was in force and was not contestable.

87.     On December 2, 2008, AXA processed the change of ownership and beneficiary form submitted on behalf of Coventry First, which, on information and belief, would not have been possible if the Golden Policy had lapsed.

---

[8] Generally, the grace period is the period during which a policy owner's failure to make a premium payment can be cured.

88.     On December 3, 2008, in reliance on AXA's representations, Coventry First completed its purchase of the Golden Policy for an amount exceeding $75,000.  This life settlement is governed by Florida law.

89.     On or about December 3, 2008, Coventry First sold the Golden Policy to LST.

90.     On December 17, 2010, Coventry First repurchased the Golden Policy from LST, including all of LST's rights, title, and interest in the policy, and of LST's rights, remedies, powers, and privileges with respect to the policy.  All claims that Coventry First or LST has had at any time with respect to the Golden Policy are currently owned by Coventry First.

91.     On December 11, 2008 AXA informed Coventry First that the Golden Policy had lapsed on December 8, 2008.  Coventry First received a policy termination notice from AXA on December 18, 2008.

92.     As the owner of the Golden Policy, Coventry First had the contractual right to reinstate the policy if (1) the insured person is alive; (2) the restoration is requested within 5 years of the end of the grace period; (3) evidence of insurability is provided; and (4) payment is made.  Coventry First met each of these requirements—except the fourth, as AXA wrongfully refused Coventry First's offers to repay any outstanding premiums—and repeatedly requested reinstatement of the Policy.[9]  AXA, however, denied each of these requests, claiming Coventry First had a "Questionable Insurable Interest" in the Golden Policy.

93.     Upon information and belief, AXA claimed a "Questionable Insurable Interest" with respect to the Golden Policy because Coventry First is a life settlement provider and AXA is trying to discourage life settlement companies from buying its policies.

94.     Upon information and belief, AXA never had any legitimate insurable interest concern regarding the Golden Policy.

---

[9] To the extent there were any other conditions precedent to Coventry First's exercise of its reinstatement rights, Coventry First satisfied them as well.

95.    Upon information and belief, AXA asserts insurable interest challenges to life settlement policies, and potential life settlement policies, in an effort to frustrate life settlement transactions and obstruct the life settlement market.

96.    Based on AXA's assertion that the Golden Policy was terminated, Coventry First was unable to sell the policy to an institutional investor.

97.    Because of AXA's actions with respect to the Golden Policy, Coventry First has suffered and continues to suffer financial harm in excess of $75,000, including but not limited to its lost profits on the sale of the policy, the impaired value of the Golden Policy, and other costs, damages, and expenses.

* * * * *

98.    The foregoing are merely examples of AXA's pattern of conduct designed to undermine life settlement transactions and obstruct the life settlement market.

99.    Upon information and belief, AXA uses its ability to question the insurable interest of a policy as a catch-all means of impairing, frustrating, and invalidating life settlement transactions.

### 2.    AXA Takes Actions to Wrongfully Impede Other Life Settlement Providers.

100.    AXA has claimed that its actions with respect to the Donahue and Folkenflik Policies were merely "mistakes." As further proof that AXA's actions complained of herein were not accidental, it is noteworthy that they echo tactics AXA recently employed against another life settlement company, Life Settlement Corp ("LSC"). In *Settlement Funding LLC v. AXA Life Ins. Co.*, the plaintiff, LSC, a life settlement provider, alleged that it purchased a life insurance policy after AXA's assurances that the policy was no longer contestable.

101.    AXA subsequently continued to collect all premium payments on the policy until the policy matured on June 6, 2009—more than a year after the contestability period had expired. When the time came for LSC to collect on the policy, however, AXA refused to pay LSC's claim

19

and filed an Ohio state court action seeking a declaration that the policy was invalid *ab initio* for lack of an insurable interest.

102.    LSC sued for damages in this Court,[10] alleging that AXA's misrepresentations were part of a pattern and practice: "[B]y information and belief, AXA has a practice of not conducting any investigation on its policies before or during the contestability period or conducting an investigation but doing nothing to timely contest the policies because it wants to collect the premiums and, more importantly, increase, inflate or exaggerate the value of its assets in its financial statements.  AXA will then routinely try to contest the validity of its policies either at the eleventh hour of the contestability period or after the expiration thereof[] . . . . Moreover, despite claiming that policies are invalid *ab initio*, AXA routinely tries to retain the premium collected under such policies.  It is a lucrative scheme."[11]

103.    On October 25, 2010, a jury sitting in the U.S. District Court for the Southern District of New York found that AXA had made negligent misrepresentations to LSC and that the policy in question was not, in fact, contestable.  The jury also rejected AXA's claim that LSC had acted improperly in connection with the policy in question.  The jury awarded LSC $5 million in damages incurred because of AXA's misrepresentations.  *Settlement Funding LLC v. AXA Life Ins. Co.*, No. 09-CV-8685-HB (S.D.N.Y Oct. 25, 2010).

---

[10] AXA argued to the Court that the federal action should be dismissed under the *Colorado River* doctrine in deference to the Ohio state court action.  The Ohio state court, however, dismissed AXA's state court action and AXA was compelled to withdraw its argument for dismissal of the federal suit.  Letter on March 24, 2010 from AXA to the Honorable Judge Harold Baer, Jr., of the U.S. District Court for the Southern District of New York, *Settlement Funding LLC v. AXA Equitable Life Ins. Co.*, No. 09-CV-8685-HB (S.D.N.Y 2010).

[11] Am. Compl. at 9, *Settlement Funding LLC v. AXA Equitable Life Ins. Co.*, No. 09-CV-8685-HB (S.D.N.Y 2010).

3.    **AXA Works to Thwart Life Settlements by Enforcing a Gag Rule Against Financial Professionals Who Are Honest With Their Clients About Life Settlements.**

104.    Upon information and belief, AXA has adopted a policy that expressly prohibits its affiliated financial professionals and independent insurance agents from participating in any life settlement activity.

105.    Upon information and belief, AXA further requires its financial professionals to certify on each life insurance application that neither they nor their clients intend to engage in a life settlement transaction or any other secondary market activity.

106.    Upon information and belief, if AXA determines that a policy owner contemplates selling the policy in the secondary market at some point in the future, the financial professional who worked with the policy owner is subject to disciplinary action up to and including termination and forfeiture of compensation and other benefits.

107.    On information and belief, AXA also has enacted a policy and practice of discouraging its independent agents from discussing life settlements with purchasers of insurance.

108.    On information and belief, AXA enforces this policy by punishing or withholding benefits from agents who discuss honestly with their customers the potential of entering into a life settlement.

109.    For example, on information and belief, AXA cancelled an incentive program in order to punish certain brokers for violating its "code of silence" regarding life settlements.

110.    This is another example of AXA's intentional efforts to harm Coventry First, other life settlement providers, and AXA's own policy holders.

4.    **AXA Participates in a Self-Described "Delta Force" to Suppress the Life Settlement Market.**

111.    As further evidence that AXA acted intentionally to harm Coventry First and thereby inhibit policy holders' access to the life settlement market, AXA participates in a self-proclaimed "Delta Force" of lawyers, other insurers, and third parties to deter life settlements

21

and discourage consumers, life settlement providers, and investors from participating in life settlements.

112.    For example, in an effort to harm Coventry First (as well as Mr. Donahue and Wells Fargo), and to discourage them and others from participating in life settlements involving AXA policies, the Delta Force filed a summons with notice against Mr. Donahue, Coventry First, and Wells Fargo in state court in New York, seeking a declaratory judgment that, *inter alia*, the Donahue Policy was void due to a lack of insurable interest, despite the fact any insurable interest issue would have arisen when the policy was issued, five years before the policy was purchased by Coventry First.

113.    AXA dismissed the summons shortly after it was filed, after Coventry First promised to seek its attorneys' fees. Coventry First believes the summons was improperly filed for delay and harassment because (1) claims made in the New York state suit were properly counterclaims in another suit, which was filed first; (2) Wells Fargo was not a proper party and was not sued for any justifiable reason; and (3) Mr. Donahue, a resident of New Jersey, was improperly sued in New York, among other reasons.

114.    The foregoing are merely examples of AXA's intentional pattern of unlawful activities and evidence of AXA's *mens rea*. They belie any assertion by AXA that its acts are merely accidental, coincidental, or the product of mistakes. To the contrary AXA has acted intentionally to wrongfully harm Coventry First (and AXA's policy holders and other consumers) by disrupting Coventry First's business and suppressing the life settlement market, including by defrauding Coventry First as described herein.

## CAUSES OF ACTION
### COUNT I
### (Damages Pursuant to the New Jersey Viatical Settlement Act)

115.    Paragraphs 1–114, above, are incorporated herein.

116.    The New Jersey Viatical Settlements Act defines a "fraudulent viatical settlement act" to include "[a]cts or omissions committed by any person who, knowingly or with intent to

22

defraud, for the purpose of depriving another of property or for pecuniary gain, commits, or permits its employees or its agents to engage in acts including: (a) Presenting, causing to be presented or preparing with knowledge or belief that it will be presented to . . . a viatical settlement provider . . . false material information, or concealing material information, as part of, in support of or concerning a fact material to one or more of the following: (i) An application for the issuance of a viatical settlement contract or insurance policy; . . . . (vii) The solicitation, offer, effectuation or sale of a settlement contract or insurance policy; [or] (viii) The issuance of written evidence of a viatical settlement contract or insurance[.]" N.J. Stat. § 17B:30B-2 (2010). Fraudulent viatical settlement acts are prohibited in New Jersey, *see id.* § 17B:30B-12(a) (2010), and are punishable by civil penalties of up to $10,000, *see* § 17B:30B-13(e), and imprisonment, *see id.* § 17B:30B-13(g) (2010).

117.    The New Jersey Viatical Settlement Act creates a private civil right of action for parties, like Coventry First, that have been injured by an insurer's violation of the Act. N.J. Stat. § 17B:30B-13(b).

118.    In connection with the Donahue Policy, AXA, upon information and belief, knowingly and with an intent to defraud, and for the purpose of depriving Coventry First of property (including but not limited to the policy and premiums thereon)—and for its own pecuniary gain derived from, *inter alia*, suppressing the life settlement market and receiving premiums—provided material, false information to, and/or concealed material information from, Coventry First, a viatical settlement provider, by providing Coventry First with false information regarding the Donahue Policy's contestability.

119.    As set forth above, the false information provided by AXA was material to, *inter alia*, the solicitation, offer, and application for, and the contract effectuation, sale, and issuance of, the viatical settlement contract regarding the Donahue Policy.   It also was material to Coventry First's repurchase of the Donahue Policy after selling it to an investor.

120.    Coventry First relied in good faith on information supplied by AXA in purchasing, and later repurchasing, the Donahue Policy.

23

121.    Coventry First is entitled to recover for its monetary damages caused by AXA's violations of the New Jersey Viatical Settlement Act, which exceed $75,000.

## COUNT II
### (Declaratory Judgment – The Donahue Policy)

122.    Paragraphs 1–121, above, are incorporated herein.

123.    This Court has the power to declare the rights of the parties under 28 U.S.C. § 2201.  The parties have adverse legal interests, including regarding whether the Donahue Policy is invalid, void, or unenforceable due to an insurable interest issue.  The facts set forth above are sufficiently concrete to allow for a conclusive legal judgment, and a declaratory judgment would be useful to the parties.

124.    Coventry First is entitled to a declaration pursuant to 28 U.S.C. § 2201 that the Donahue Policy is valid, in full force and effect, and fully enforceable against AXA, and that there are no insurable interest issues affecting the Donahue Policy.

## COUNT III
### (Damages Pursuant to the Nevada Viatical Settlement Act)

125.    Paragraphs 1 –124, above, are incorporated herein.

126.    The Nevada Viatical Settlement Act provides that it is "a category D felony . . . for any person, knowingly or with intent to defraud, to do any of the following acts in order to deprive another of property or for his own pecuniary gain: . . . Present, cause to be presented or prepare with knowledge or belief that it will be presented, false information to . . . a provider . . . of viatical settlements . . . or to conceal information, as part of, in support of or concerning a fact material to:  . . . (d) A premium paid on a policy or as a result of an agreement to purchase a viatical settlement; (e) A payment or change of beneficiary or ownership pursuant to a policy or viatical settlement; . . . or (h) The issuance of written evidence of a policy, viatical settlement or agreement to purchase a viatical settlement." Nev. Rev. Stat. Ann. § 688C.450 (West 2010).

127.    The Nevada Viatical Settlement Act creates a private civil right of action for parties, like Coventry First, that have been injured by an insurer's violation of the Act, allowing

such parties "to recover the damages suffered." Nev. Rev. Stat. Ann. § 688C.510(2) (West 2010).

128.    In connection with the Folkenflik Policy, AXA upon information and belief, knowingly and with an intent to defraud, and for the purpose of depriving Coventry First of property (including but not limited to the policy and premiums thereon)—and for its own pecuniary gain derived from, *inter alia*, suppressing the life settlement market and receiving premiums—provided material, false information to, and/or concealed material information from, Coventry First, a viatical settlement provider, by providing Coventry First with false information regarding the Folkenflik Policy's contestability.

129.    As set forth above, the false information provided by AXA was material to the premiums paid on and the change of beneficiary and ownership with respect to the Folkenflik Policy. It also was material to Coventry First's repurchase of the Folkenflik Policy.

130.    Coventry First relied in good faith on information supplied by AXA in purchasing, and later repurchasing, the Folkenflik Policy.

131.    Coventry First is entitled to recover for its monetary damages caused by AXA's violations of the Act, which exceed $75,000.

## COUNT IV
### (Declaratory Judgment – The Folkenflik Policy)

132.    Paragraphs 1–131, above, are incorporated herein.

133.    This Court has the power to declare the rights of the parties under 28 U.S.C. § 2201. The parties have adverse legal interests, including regarding whether the Folkenflik Policy is invalid, void, or unenforceable due to an insurable interest issue. The facts set forth above are sufficiently concrete to allow for a conclusive legal judgment, and a declaratory judgment would be useful to the parties.

134.    Coventry First is entitled to a declaration pursuant to 28 U.S.C. § 2201 that the Folkenflik Policy is valid, in full force and effect, and fully enforceable against AXA, and that there are no insurable interest issues affecting the Folkenflik Policy.

25

## COUNT V
### (Fraudulent Inducement/Intentional Misrepresentation)

135.   Paragraphs 1–134, above, are incorporated herein.

136.   During the course of its regular business, AXA made representations, including those made on January 7, 2009 and March 25, 2009, to Coventry First about the Donahue and Folkenflik Policies, respectively, through written and oral VOCs.

137.   AXA's representations regarding the Donahue and Folkenflik Policies, respectively, were made before Coventry First purchased the relevant policy.

138.   AXA's representations that the policies were incontestable were, on information and belief, made with knowledge and intent as to their falsity or with recklessness as to whether they were true or false. AXA's knowledge, intent, and recklessness are evidenced by, *inter alia*, the acts described above. *See* ¶¶ 24-113.

139.   AXA knew and intended that its false representations were provided, in the ordinary course of AXA's business activities, as business guidance to Coventry First.

140.   AXA knew and intended that its false representations would be relied on by Coventry First in deciding to purchase the Donahue and Folkenflik Policies.

141.   The information underlying AXA's misrepresentations as to contestability is uniquely within AXA's knowledge and control.

142.   AXA made the false representations to induce Coventry First's reliance thereon.

143.   Coventry First relied on AXA's misrepresentations concerning the policies in purchasing them.

144.   AXA supplied its false representations to Coventry First for AXA's own pecuniary gain. As set forth above, AXA realized pecuniary benefit when Coventry First purchased the policies and premiums were paid on the policies, which would not have happened but for AXA's misrepresentations. AXA also derives pecuniary benefit by disrupting the life settlement industry, an intended target and effect of AXA's misrepresentations.

145.    AXA's false representations about the Donahue and Folkenflik Policies were made with the intent of misleading Coventry First into relying on these false representations and purchasing the Donahue and Folkenflik Policies, setting up the later disruption of Coventry First's life settlement business when AXA changed its story and later declared the policies to be contestable.  On information and belief, it also was AXA's intention to dissuade Coventry First from entering life settlement transactions with other AXA policy holders, thus securing for AXA its windfall profits when the policies lapsed or were surrendered to AXA.

146.    Due to Coventry First's reasonable and justifiable reliance on AXA's false representations with regard to the Donahue and Folkenflik Policies, Coventry First suffered economic and pecuniary loss in excess of $75,000.

## COUNT VI
### (Fraud/Intentional Misrepresentation (In the Alternative))

147.    Paragraphs 1–146 above, are incorporated herein.

148.    During 2009, AXA made contrary and conflicting statements to Coventry First regarding the contestability of the Donahue and Folkenflik Policies.  As set forth above, in early 2009, AXA stated that *neither* policy was contestable; in April 2009 (as to Folkenflik) and October 2009 (as to both Folkenflik and Donahue), it reversed itself and stated that *both* policies were contestable.  AXA made the misrepresentations to induce Coventry First's reliance thereon. Coventry First relied on both statements and Coventry First was damaged as a result.  Because only AXA is in a position to know which if any, of its statements was accurate, Coventry First brings this Count VI in the alternative.[12]

149.    During the course of its regular business, including on October 29, 2009, AXA made representations to Coventry First about the Donahue Policy, including through written and oral VOCs.

---

[12] Depending on the evidence that becomes available during discovery, Coventry First reserves its right to allege and prove at trial that both sets of statements were false.

150.   In that representation, made after Coventry First had sold the Donahue Policy to a third party, AXA falsely stated that the Donahue Policy was contestable.

151.   During the course of its regular business, including on April 2, 3, and 6, 2009, AXA made representations to Coventry First about the Folkenflik Policy, including through written and oral VOCs.

152.   In that representation, made after Coventry First had sold the Folkenflik Policy a third party, AXA falsely stated that the Folkenflik Policy was contestable.

153.   AXA's representations that the policies were contestable were, on information and belief, made with knowledge and intent as to their falsity or with recklessness as to whether they were true or false. AXA's knowledge, intent, and recklessness are evidenced by, *inter alia*, the acts described above. *See* ¶¶ 24-113.

154.   AXA knew and intended that its false representations were provided, in the ordinary course of AXA's business activities, as business guidance to Coventry First.

155.   AXA knew and intended that its false representations would be relied on by Coventry First in deciding to repurchase policies that had already been sold to investors.

156.   AXA made these false representations to induce Coventry First's reliance thereon.

157.   The information underlying AXA's misrepresentations as to contestability is uniquely within AXA's knowledge and control.

158.   AXA supplied its false representations to Coventry First for AXA's own pecuniary gain. As set forth above, AXA realizes pecuniary benefit by disrupting the life settlement industry, an intended target and effect of AXA's misrepresentations. For example, AXA's changing story about the contestability of the policies was designed to and did undermine Coventry First's transactions with investor purchasers, undermined Coventry First's business and undermined its ability to fairly compete with AXA. On information and belief, it also was AXA's intention to dissuade Coventry First from entering life settlement transactions with other AXA policy holders, thus securing for AXA its windfall profits when the policies lapse or are surrendered to AXA.

28

159.    AXA's false representations about the Donahue and Folkenflik Policies were made with the intent to mislead Coventry First into relying on these false representations, to force Coventry First to repurchase the policies from the investors, and to diminish the policies' value by creating uncertainty regarding the policies.

160.    Coventry First reasonably and justifiably relied on AXA's April 2009 and October 2009 misrepresentations that the policies were contestable when it repurchased the policies, which it would not have done but for AXA's misrepresentations.

161.    Due to Coventry First's reasonable and justifiable reliance on AXA's misrepresentations, Coventry First suffered economic and pecuniary loss, including lost fees and profits on the sale of the policies, the reduced value of the policies, and the premiums paid to AXA after the policies were repurchased.

162.    The pecuniary loss suffered by Coventry First was proximately caused by AXA's false representations regarding the contestability of the Donahue and Folkenflik Policies.

## COUNT VII
## (Negligent Misrepresentation)

163.    Paragraphs 1–162, above, are incorporated herein.

164.    During the course of its regular business, AXA made representations, including those made on January 7, 2009 and March 25, 2009, to Coventry First about the Donahue and Folkenflik Policies, respectively, through written and oral VOCs.

165.    AXA's representations regarding the Donahue and Folkenflik Policies, respectively, were made before Coventry First purchased the relevant policy and were, on information and belief, made knowingly and intentionally to Coventry First through its employees, representatives and agents, as set forth above.

166.    AXA's representations that the policies were not contestable were, on information and belief, negligently made. AXA's negligence is evidenced by, *inter alia*, AXA's repeated and conflicting statements about the contestability of the policies despite having within its exclusive

29

knowledge and control the information necessary to determine contestability, and other acts described herein.

167.    AXA knew that its false representations were provided as business guidance to Coventry First in the ordinary course of AXA's business activities, before the parties were in privity.

168.    AXA knew that its false representations would be and were used by Coventry First to make decisions about which policies were suitable for life settlement transactions. Specifically, AXA's false representations about the Donahue and Folkenflik Policies were made with the knowledge and intent that Coventry First would rely on the false representations in purchasing the Donahue and Folkenflik Policies.

169.    AXA supplied false information to Coventry First for AXA's own pecuniary gain. As set forth above, AXA realized pecuniary benefit when Coventry First purchased the policies and premiums were paid to AXA, which would not have occurred but for AXA's misrepresentations.    AXA also derives pecuniary benefit by disrupting the life settlement industry, an effect of AXA's misrepresentations.

170.    Due to Coventry First's reasonable and justifiable reliance on AXA's misrepresentations, Coventry First suffered economic and pecuniary loss, including lost fees and profits on the sale of the policies, the reduced value of the policies, and the premiums paid to AXA after the policies were repurchased.

171.    The pecuniary loss suffered by Coventry First was proximately caused by AXA's false representations with respect to the Donahue and Folkenflik Policies.

## COUNT VIII
### (Negligent Misrepresentation (In the Alternative))

172.    Paragraphs 1–171, above, are incorporated herein.

173.    During 2009, AXA made contrary and conflicting statements to Coventry First regarding the contestability of the Donahue and Folkenflik Policies. As set forth above, in early 2009, AXA stated that *neither* policy was contestable; in April 2009 (as to Folkenflik) and

October 2009 (as to both Folkenflik and Donahue), it reversed itself and stated that *both* policies were contestable. AXA made the misrepresentations to induce Coventry First's reliance thereon. Coventry First relied on both statements and Coventry First was damaged as a result. Because only AXA is in a position to know which, if either, of the statements was accurate, Coventry First brings this Count VIII in the alternative.[13]

174.    During the course of its regular business, including on October 26 and 29, 2009, AXA made representations to Coventry First about the Donahue Policy, including through written and oral VOCs.

175.    In that representation, made after Coventry First had sold the Donahue Policy to a third party, AXA falsely stated that the Donahue Policy was contestable.

176.    During the course of its regular business, including on April 2, 3, and 6, 2009, AXA made representations to Coventry First about the Folkenflik Policy, including through written and oral VOCs.

177.    In those representations, made after Coventry First had sold the Folkenflik Policy a third party, AXA falsely stated that the Folkenflik Policy was contestable.

178.    AXA's representations that the policies were contestable were, on information and belief, made negligently with respect to whether they were true or false. AXA's negligence is evidenced by, *inter alia*, AXA's repeated and conflicting statements about the contestability of the policies despite having within its exclusive knowledge and control the information necessary to determine contestability, and other acts described herein.

179.    AXA knew and intended that its false representations were provided, in the course of AXA's business activities, as business guidance to Coventry First after the parties no longer were in privity.

---

[13] Depending on the evidence that becomes available during discovery, Coventry First reserves its right to allege and prove at trial that *both* sets of statements were false.

180.     AXA knew and intended that its false representations would be relied on by Coventry First in deciding to repurchase policies that already had been sold to investors.

181.     AXA supplied its false representations to Coventry First for AXA's own pecuniary gain.  As set forth above, AXA realized pecuniary benefit when Coventry First repurchased the policies and premiums were paid on the policies, which would not have occurred but for AXA's misrepresentations.  AXA also derives pecuniary benefit by disrupting the life settlement industry, an effect of AXA's misrepresentations.

182.     AXA's false representations about the Donahue and Folkenflik Policies were made with the knowledge and intent that Coventry First would rely on the false representations, forcing Coventry First to repurchase the policies from investors, and that the misrepresentations would cast uncertainty over the policies and diminish their value.

183.     Coventry First reasonably and justifiably relied on AXA's misrepresentation that the policies were contestable when it repurchased the policies, which it would not have done but for AXA's misrepresentations.

184.     Due to Coventry First's reasonable and justifiable reliance on AXA's misrepresentations, Coventry First suffered economic and pecuniary loss, including lost fees and profits on the sale of the policies, the reduced value of the policies, and the premiums paid to AXA after the policies were repurchased.

185.     The pecuniary loss suffered by Coventry First was proximately caused by AXA's false representations regarding the contestability of the Donahue and Folkenflik Policies.

### COUNT IX
### (Breach of Contract)

186.     Paragraphs 1–185, above, are incorporated herein.

187.     The Golden Policy is a valid, incontestable life insurance contract between Coventry First and AXA that existed and was established on December 3, 2008 when Coventry First purchased the Golden Policy, with consideration, from its prior owner.  As further

32

consideration for the contract, premiums were tendered to AXA after Coventry First purchased the Golden Policy.

188.   The contract between AXA and Coventry First includes an express provision that detailed the terms for reinstating the Golden Policy if it happened to lapse, as stated above.

189.   Coventry First satisfied all conditions precedent to AXA's performance under the contract, including AXA's obligation to reinstate the Golden Policy.

190.   AXA claims that the Golden Policy lapsed on December 8, 2008.   After the Golden Policy allegedly lapsed, AXA materially breached its life insurance contract with Coventry First by repeatedly refusing to reinstate the Golden Policy.   These repeated refusals disregarded the fact that Coventry First had met all of the contractual requirements for reinstating the policy.

191.   In addition to breaching the parties' contract, AXA's repeated refusals to honor its contract with Coventry First demonstrated a lack of good faith cooperation with Coventry First, and violated the implied covenant of good faith and fair dealing.

192.   AXA terminated and refused to restore the Golden Policy, which has a face value of $12.5 million.  AXA's material breach of this life insurance contract damaged Coventry First, including but not limited to (a) depriving Coventry First of a portion of the purchase price paid for the Golden Policy, (b) the costs and expenses that Coventry First incurred with respect to the Golden Policy, and (c) the loss of the Golden Policy's death benefit and/or profits that would have been realized on the sale of the policy.

193.   AXA's breach of the parties' contract, including its breach of the covenant of good faith and fair dealing, directly and proximately damaged Coventry First in an amount exceeding $75,000.

## COUNT X
### (Declaratory Judgment – The Golden Policy)

194.   Paragraphs 1–193, above, are incorporated herein.

33

195.    This Court has the power to declare the rights of the parties under 28 U.S.C. § 2201. The parties have adverse legal interests, including whether the Golden Policy was properly terminated by AXA, whether AXA has a contractual obligation to reinstate the Golden Policy, and whether the Golden Policy is invalid, void, or unenforceable due to an insurable interest issue. The facts set forth above are sufficiently concrete to allow for a conclusive legal judgment, and a declaratory judgment would be useful to the parties.

196.    Coventry First are entitled to a declaration pursuant to 28 U.S.C. § 2201 that AXA wrongfully terminated the Golden Policy, that Coventry First are entitled to reinstatement of the Golden Policy, that the Golden Policy is valid, in full force and effect, and fully enforceable against AXA, and that there are no insurable interest issues affecting the Golden Policy.

### COUNT XI
### (Tortious Interference with Contract)

197.    Paragraphs 1–196, above, are incorporated herein.

198.    Coventry First entered into a valid contractual relationship with the institutional investors that purchased the Donahue and Folkenflik Policies.

199.    AXA knew that these contracts existed but, as set forth above, AXA, upon information and belief, purposefully intended to harm the existing contractual relationship by issuing repeated written confirmations about the incontestability of the Donahue and Folkenflik Policies, followed by notices of contestability on these policies, and by refusing to disavow its assertion that that an insurable interest issue exists with respect to the Donahue Policy, as stated above.

200.    AXA was not privileged or justified when it provided Coventry First with false and inconsistent VOCs and refused to disavow its assertion that that an insurable interest issue exists with respect to the Donahue Policy.

201.    Coventry First has been foreseeably and proximately damaged in excess of $75,000 by AXA's actions, including from its lost fees and profits on the sales the Donahue and

34

Folkenflik Policies and the expenditure of resources in the purchase and maintenance of the policies, which Coventry First repurchased and Coventry First could not fairly resell due to the uncertainty resulting from AXA's actions.

202.    Coventry First suffered these damages as a result of AXA's tortious interference with Coventry First's contracts.

WHEREFORE, Coventry First respectfully asks the Court to:

1.    Declare that the Donahue, Folkenflik, and Golden Policies are valid, are in full force and effect, and are fully enforceable against AXA, that there are no insurable interest issues affecting any of the policies, and that Coventry First is entitled to reinstatement of the Golden Policy;

2.    Award Coventry First compensatory and punitive damages in excess of $75,000.00 to be proved at trial;

3.    Award Coventry First all costs and interest allowed by law;

4.    Award Coventry First such other relief as is just and reasonable; and

5.    Provide Coventry First with the right to amend this Complaint in the event the Court determines Coventry First has failed to adequately plead any of the foregoing claims against AXA or as other events may warrant.

By: _____

WILLIAMS & CONNOLLY LLP
David Kurtzer-Ellenbogen (DK5611)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
dkurtzer@wc.com

*Attorneys for Coventry First LLC*

Dated: December 17, 2010